TECHNIC, INC.

v.

RHODE ISLAND DEPARTMENT OF EMPLOYMENT AND TRAINING et al.

No. 93–582 M.P.

Supreme Court of Rhode Island.

Jan. 23, 1996.

William G. Brody, Providence, for Plaintiff.

Thomas Brown and Gardner H. Palmer, Jr., Providence, for Defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on a petition for certiorari by Technic, Inc. (Technic or petitioner), to review a judgment of the District Court that affirmed a final decision rendered by the Board of Review (board) of the Department of Employment and Training (DET). The board affirmed the DET's determination that Wayne Young, Jr. (claimant), a former employee of Technic, was eligible for unemployment benefits because he was terminated under nondisqualifying conditions. In its petition for certiorari, Technic argued that the board's determination that the claimant had not been discharged for "proved misconduct," pursuant to G.L.1956 (1986 Reenactment) § 28–44–18, as amended by P.L.1989, ch. 267, § 1 of the Rhode Island Employment Security Act, was clearly erroneous. We agree. Consequently, we grant the petition for certiorari and quash the judgment of the District Court. The facts insofar as pertinent to this petition follow.

### Facts and Procedural History

The claimant was discharged by Technic on April 7, 1992, for alleged actions that petitioner considered were contrary to its best interests. In challenging its former employee's claim for employment-security benefits, petitioner argued that claimant was subject to disqualification under the provisions of § 28–44–18 because he had been discharged for proved misconduct. In a decision dated April 29, 1992, the director of DET (director) found that insufficient evidence had been presented to establish proved misconduct and held that because claimant was terminated under nondisqualifying conditions, he was eligible to collect employment-security benefits. The petitioner filed a timely appeal and a hearing was held, on May 18, 1992, before a board referee (referee).

At that hearing, Frank Shoushanian (Shoushanian), president of Technic, testified that claimant was discharged following a long history of tardiness, drug-related problems, a habit of sleeping on the job, and evidence that he had stolen slivers of gold from the workplace. Shoushanian further testified that shortly before claimant was terminated, large quantities of gold were discovered missing from vessels in claimant's work area, and the Cranston police were called in to investigate the matter. According to Shoushanian's testimony, it was in the course of

the police investigation that petitioner learned that claimant had allegedly sold marijuana to another employee at Technic and that claimant had allegedly admitted stealing gold from Technic prior to the disappearance of the 600 ounces.

David Weisberg (Weisberg), vice-president of Technic, testified that claimant was terminated for three reasons: he sold drugs at Technic, he stole slivers of gold from Technic, and 600 ounces of gold had disappeared from claimant's work area. Weisberg further stated that there was no conclusive evidence that it was claimant who had taken the 600 ounces of gold.

In a decision rendered on May 21, 1992, the referee found that "[a]lthough other reasons were mentioned, it is obvious the claimant was terminated because he was suspected of taking slivers of gold, which amounted to a total loss of six hundred and five ounces." The referee determined that petitioner had failed to present sufficient evidence to substantiate its contention that claimant had stolen the gold and held that claimant's termination was nondisqualifying under § 28–44–18. Therefore, she affirmed the decision of the director that claimant was eligible for employment-security benefits.

The petitioner next appealed to the board, which reviewed the evidence and also heard directly from William Vincent (Vincent) regarding claimant's sale of illegal drugs at Technic. The board affirmed the referee's decision, then later allowed petitioner to reopen the matter, reviewed the evidence once more, and again affirmed the referee's decision. The petitioner then filed a complaint for judicial review, pursuant to G.L.1956 (1993 Reenactment) § 42–35–15, and on October 8, 1993, the District Court affirmed the decision of the board.

On October 28, 1993, Technic filed a petition for issuance of a writ of certiorari, pursuant to § 42–35–16, that was granted on *September 28, 1994.*

## Standard of Review

■ In reviewing a decision of an administrative agency by way of certiorari, this court does not weigh the evidence but, rather, reviews the record in order to determine whether legally competent evidence supports the findings of the tribunal whose decision is under review. *Ryan v. Zoning Board of Review of New Shoreham,* 656 A.2d 612, 615 (R.I.1995); *Sartor v. Coastal Resources Management Council,* 542 A.2d 1077, 1082–83 (R.I.1988); *Berberian v. Department of Employment Security,* 414 A.2d 480, 482 (R.I.1980). Accordingly, we must consider whether the board's determination that claimant was not discharged for reasons of proved misconduct within the meaning of § 28–44–18 was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Section 42–35–15(g)(5).

In order to impose a disqualification under the provisions of § 28–44–18, there must be proof that the discharged person committed an act of misconduct in connection with the employment. Specifically, § 28–44–18 provides that

*"[a]n individual who has been discharged for proved misconduct connected with his or her work shall thereby become ineligible for benefits* for the week in which that discharge occurred and until he or she establishes to the satisfaction of the director that he or she has, subsequent to that discharge, had at least four (4) weeks of work, and in each of that four (4) weeks has had earnings of at least twenty (20) times the minimum hourly wage as defined in * * * this title." (Emphasis added.)

Under § 28–44–18, misconduct has been defined as "conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee." *Turner v. Department of Employment Security,* 479 A.2d 740, 741 (R.I.1984) (quoting *Boynton Cab Co. v. Neubeck,* 237 Wis. 249, 259–60, 296 N.W. 636, 640 (1941)).

## Claimant's Proved Misconduct

■ On review, petitioner argued that the board's decision that claimant was not discharged for "proved misconduct" within the meaning of § 28–44–18 was clearly erroneous because the record contained undisputed evidence that claimant was terminated for misconduct, to wit, selling illegal drugs to anoth-

er employee at Technic and stealing slivers of gold from Technic. In our opinion, the evidence on the record amply substantiates petitioner's contention.

At the hearing before the referee, Shoushanian testified that claimant was discharged following a "long history of wilful misconduct" that included sleeping on the job, tardiness, and "a history with us of being on drugs." According to Shoushanian, claimant was once found "sleeping on top of a hood" in his work area and was also "caught sleeping in toilets * * * it was a laughing stock within Technic that this was going on continuously." Technic retained claimant in its employ despite these problems, Shoushanian said, because of its relationship with claimant's father, who had been an "excellent employee" for approximately twenty years. Shoushanian stated that Technic had relied specifically on the father's assurances that he would watch claimant very carefully, that claimant was "being monitored very closely as far as drugs," and that claimant was "under control." Further, Shoushanian stated that claimant's father later admitted that he had monitored claimant only "for a very short period of time and [then] he let it go."

Shoushanian next related a series of events that began approximately six months prior to claimant's termination. He testified that at about that time a management official at Technic received a tip from an individual outside Technic that claimant had been stealing slivers of gold from the facility. A thorough investigation revealed no "tangible evidence that any large amounts of gold could have been missing from his [claimant's] area," and, consequently, no action was taken against claimant at that time.

Shoushanian testified that approximately one month before claimant's discharge, a vessel was accidentally broken in claimant's work area and the solution with which he was working was spilled. According to Shoushanian, 97 to 99 percent of the gold in the solution is usually recovered in such accidents. In this particular incident, however, "the amount of gold recovered from the spill only accounted for half the gold that he [claimant] had started with," and a total of fifty ounces of gold that was "signed out" by claimant was never accounted for. Shoushanian related that shortly after the accidental spill, another 110 ounces of gold were discovered missing from a solution with which claimant had been working and claimant offered no explanation about what might have happened to the gold.

According to Shoushanian, the unexplained loss of 160 ounces of gold prompted an inventory by Technic that showed that even more gold was missing. He testified that one particular 200-ounce lot of gold, for which claimant had signed on March 19, 1992, "was completely missing" and other lots with which claimant had worked were found to be missing a total of 240 ounces. Shoushanian testified that, "When all [was] said and done, and all the lots that [claimant] was working with up to the point of his termination, we had lost 605 ounces worth $215,000 or $220,000." Shoushanian also testified that claimant had signed for the 600 ounces of gold and that claimant had assured him many times that he "never left the gold unattended." Weisberg testified that this "major gold loss" at Technic precipitated a police investigation, in the course of which Technic learned about claimant's drug sales on its premises and obtained a witness statement regarding claimant's earlier theft of slivers of gold from Technic. In summary, Weisberg stated that claimant was terminated for three major reasons: the disappearance of the 600 ounces of gold, the sale of drugs, and the theft of slivers of gold.

Because the referee found that claimant had been terminated solely for the first reason and that petitioner had presented insufficient evidence to show that claimant had stolen the 600 ounces, she determined that claimant's discharge was nondisqualifying under § 28–44–18. We note that Weisberg himself conceded at the hearing that Technic did "not have conclusive evidence that [claimant] took the 600 ounces of gold." Therefore, the board did not err in determining that there was insufficient evidence that claimant had taken the 600 ounces of gold.

Our careful review of the record, however, has revealed evidence of proven misconduct sufficient to support claimant's discharge for misconduct, specifically the sale of drugs and

the theft of slivers of gold at the workplace. A written statement was introduced at the hearing before the referee in which Vincent stated that claimant had sold marijuana to him on Technic property. The board argued on review that because Vincent's statement was dated May 14, 1992, approximately five weeks after claimant's discharge, the sale of illegal drugs could not have been a reason for his termination. The record clearly reveals, however, that Vincent also gave direct testimony at the hearing before the board that he had told Shoushanian of the drug sale *before* claimant's termination and then made his written statement a few days later. At the same hearing, Shoushanian testified that he had relied on Vincent's oral statement in reaching the decision to discharge claimant.

The petitioner testified that the police investigation also produced a witness statement that claimant had taken slivers of gold from Technic *prior* to the "major gold loss" that precipitated that investigation. At the hearing before the referee, a signed statement was introduced in which one Derrick Lorenz stated that he had seen slivers of gold in claimant's car the previous year and that claimant had told him that the gold was "from work." Shoushanian further testified that Randy DeFosse (DeFosse), in a statement made to the police in the course of their investigation at Technic, had confirmed the earlier rumors that DeFosse had driven claimant to a pawn shop to sell slivers of gold.

We conclude, therefore, that the petitioner has established that the claimant was discharged for acts of proved misconduct in the course of his employment. The petitioner presented uncontroverted and unrefuted evidence of the claimant's sale of marijuana and his theft of slivers of gold, independent of the missing 600 ounces, whereas the claimant offered no evidence to refute the petitioner's case against him. Consequently, we hold that the decision of the board was clearly erroneous in view of the substantial, reliable, and undisputed evidence on the record.

Accordingly we grant the petition for certiorari and quash the judgment of the District Court, to which we remand the papers in this case with our decision duly endorsed thereon.