DECISION
This action is an appeal of an administrative agency decision. The Appellant, Rhode Island Mortgage Store, Inc. (the Appellant), asserts that it was aggrieved when the Rhode Island Department of Labor and Training (DLT), acting by and through its Division of Labor Standards (the Department), ordered the Appellant to pay Appellee Cynthia A. Clauson (the Appellee) commissions that allegedly were owed.[1]
Jurisdiction is pursuant to G.L. 1956 § 42-35-15, the Administrative Procedures Act.
 I Facts and Travel
The Appellee was employed by the Appellant as a closing manager in an office located at 250B Centerville Road, Warwick. HearingTranscript (Tr.), dated February 26, 2007, at 6. She worked at that location from July 5, 2004, until June 15, 2005. Id. The Appellant initially paid the Appellee an hourly wage of $12, as well as a $200 commission for every loan that she secured. Id. at 7. *Page 2 
Sometime in April 2005, the Appellant hired Jessica Lemire (Ms. Lemire) as an additional closing manager.[2] Id. at 14. According to the Appellee, upon Ms. Lemire's hire, a verbal agreement was reached among the branch manager, Thomas Huling, Ms. Lemire, and the Appellee, whereby the Appellee and Ms. Lemire each would receive a $10 hourly wage, and they would split all of the $200 commissions, regardless of who was listed as the loan processor. Id. at 14-15, and 88. The Appellee testified that this arrangement ceased to exist when Ms. Lemire left Appellant's employment a few weeks later; instead, the Appellee stated, her previous remuneration arrangement was reinstated by oral agreement.Id. at 15 and 17.
The Appellant denies that the $200 commission rate was restored, and its sole witness, General Manager Brian Allen Truss, testified that he was unaware of any such oral agreement. Id. at 63. Furthermore, although the Appellant objected to the amount claimed by the Appellee, it did concede that some unpaid commissions may exist. Id. at 78-80 and 86
At the hearing, the Appellee provided pay-check stubs indicating that on May 6, 2004, she received a $12 hourly wage rate, and that from April 13, 2004, to April 27, 2004, she received $10 per hour. Her June 3, 2004 pay-check stub indicates that once again, she was receiving $12 per hour.
On January 27, 2007, the Appellee filed a complaint, pro se, with the Department. She asserted that the Appellant had failed to pay her $2800 in unpaid wages, and $5200 in unpaid commissions on twenty-six closed loans. After an investigation, the pay issue was resolved; *Page 3 
however, the claim for unpaid commissions remained unresolved. As a result, the Appellee requested and received a hearing pursuant to G.L. 1956 § 28-14-19, entitled Payment of Wages.[3]
On February 26, 2004, the Department conducted a hearing. Although the Appellant's President was present, he did not testify. The only witness to testify on the Appellant's behalf was Mr. Truss. During the course of the hearing, it became evident that Mr. Truss was not personally familiar with the events surrounding this claim. However, he submitted trust documents that he alleged demonstrated that other employees closed many of the loans that the Appellee claimed to have closed. To support this allegation, he testified that the top of the documents that showed who closed the loans could not be altered because of a built-in computer safety program.
After the hearing, the Department issued a written decision granting the Appellee's claim for $5200. It also ordered the Appellant to pay a fifty-percent penalty of $2600 to the DLT. The Appellant filed a timely appeal.
 II Standard of Review
The Administrative Procedures Act provides this Court with appellate review jurisdiction over a DLT decision. G.L. 1956 § 42-35-15(g). Said statute provides:
 "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the *Page 4 
administrative findings, interferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Id.
When reviewing a decision under the Administrative Procedures Act, this Court may not substitute its judgment for that of the agency on questions of fact. Johnston Ambulatory Surgical Ass'n, Inc. v.Nolan, 755 A.2d 799, 805 (R.I. 2000). Accordingly, "[t]he court is limited to an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision." Barrington Sch. Comm. v. Rhode Island State Labor RelationsBd., 608 A.2d 1126, 1138 (R.I. 1992). Furthermore, "[l]egally competent evidence is indicated by the presence of `some' or `any' evidence supporting the agency's findings." Rhode Island Pub. TelecommunicationsAuth. v. Rhode Island State Labor Relations Bd., 650 A.2d 479, 485 (R.I. 1994).
An agency's decision "can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." Costa v. Registrar of Motor Vehicles, 543 A.2d 1307,1309 (R.I. 1988). Reviewing Courts should uphold a decision when the administrators have acted within their authority. Goncalves v. NMUPension Trust, 818 A.2d 678, 683 (R.I. 2003) (citing Doyle v. PaulRevere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998));see also, Coleman v. Metropolitan Life Ins. Co., 919 F.Supp. 573, 580
(D.R.I. 1996).
Additionally, it is well-established that "[t]his Court does not substitute its judgment for that of the agency concerning the credibility of witnesses or the weight of the evidence concerning questions of fact." Foster-Glocester Regional School Committee v. Boardof *Page 5 Review, 854 A.2d 1008, 1012 (R.I. 2004) (quoting Tierney v. Departmentof Human Services, 793 A.2d 210, 213 (R.I. 2002)). Accordingly, |
 "The presence of credibility determinations at the [hearing] level raises the level of scrutiny that the appellate division applies. The [hearing officer's] impressions as he or she observes a witness and listens to testimony are all important to the evidence sifting which precedes a determination of what to accept and what to disregard. Observations of live testimony necessarily enter into a determination of what the [hearing officer] believes and disbelieves. The weight of the evidence . . . is to be determined by the touchstone of credibility. That touchstone, however, is not available to the [appellate division] which never sees the witness or hears him [or her] testify and which, on review, looks only at a silent record. As a consequence, when credibility evaluations are implicated, [our Supreme Court has] imposed a standard of review upon the appellate division that requires it to defer to the evidentiary findings of the [hearing officer]. Before disturbing findings based on credibility determinations, the appellate division must first find that the [hearing officer] was clearly wrong.Environmental Scientific Corp. v. Durfee, 621 A.2d 200, 206 (R.I. 1993) (internal citations and quotations omitted).
With the aforementioned legal principles in mind, the Court now will proceed to review the Department's decision. Additional facts will be supplied as necessary to conduct such review.
 III Analysis
The Appellant raises two issues on appeal. First, it asserts that the hearing officer erroneously calculated the amount of commissions that were due to the Appellee. Second, it maintains that there was no evidence in the record to support the imposition of a statutorily mandated fifty-percent penalty against the Appellant. *Page 6 
 A. The Decision
The Appellant maintains that the hearing officer erroneously relied upon a spread sheet submitted by the Appellee to find that the Appellant owed the Appellee $5200 in outstanding commissions because, it asserts, the spread sheet was based upon the Appellee's faulty memory and hearsay. Instead, the Appellant contends that the hearing officer should have relied upon the Appellant's unalterable and uncontroverted business records in calculating the outstanding amount owed.
In response, the Appellee counters that the hearing officer properly relied upon her pay stubs, as well as the spread sheet that the Appellee had prepared from notes she previously copied from a notice board at the Appellant's office. She further asserts that the hearing officer committed no error when he impliedly found not credible the trust documents submitted by the Appellant because although Mr. Truss asserted that certain portions of those documents could not be altered, his later testimony undermined such an assertion.
At the hearing, Mr. Truss stated that the only source of his information was from business/trust documents and that he never spoke personally to anyone from the company concerning the matter.Tr. at 82. He testified that the top portion of the trust documents indicated which employee processed each loan and that such information could not be altered due to a built-in safety program. However, Mr. Truss later admitted that he did not know whether the branch manager had the ability to alter the trust documents. Id. at 84. Further, he was unable to explain why the allegedly unalterable trust documents named Ms. Lemire as the person processing loans after she apparently no longer was employed by the Appellant. Id. Instead, he responded that he did not know when Ms. Lemire left the company. Id. *Page 7 
While being cross examined, the Appellee alleged that the Appellant's trust documents were inaccurate. Id. at 39. She later observed that one of the names on the trust documents listed as a loan processor belonged to "the computer guy." Id. at 47. In response, Appellant's counsel stated: "At least, I have documents. You have nothing but your word. And, quite frankly, your word is contrary to what's in the documents, and we'll have some testimony, as to these documents, Mr. Hearing Officer." Id. at 40.
The Appellee's version of events substantially differed from that of Mr. Truss. She testified that when she began her employment with the Appellant, she received $12 per hour, as well as a $200 commission for every loan that she closed. Id. at 7. She stated that when Ms. Lemire was hired, they each split their commissions, and the Appellee's salary was reduced to $10 per hour; however, after Ms. Lemire left a few weeks later, the Appellee's commission was restored to $200 per loan, and her wages to $12 per hour. Id. at 16-17. In support of this testimony, the Appellee offered pay-check stubs indicating that for a short period of time, she was paid $10 per hour, but that her $12 per-hour wage was resumed thereafter. Id. at 11. The Appellee also produced a "spread sheet" in support her claim for outstanding commissions. Id. at 4.
The Appellee then testified about the origin of the spread sheet. She stated that there was "a huge board in our office, and it lists by date, and week to week, of all the loans that were scheduled to close that week, and that's how I took — that's where I took the names from."Id. at 52. She further testified that she marked the names on a piece of paper and typed the spread sheet from that list Id. When asked if she had taken a picture of the board, the Appellee responded, "No. I didn't think I needed it at the time." Id. However, although the Appellee was unable to produce documents showing the exact loans that she had closed, the hearing officer *Page 8 
pointed out that such documents "would be in the possession of her employer." Id. at 34. The Appellant did not produce those documents at the hearing.
After reviewing the record, the Court concludes that there existed legally competent evidence to support the Department's decision. The pay-check stubs and spread sheet supported the Appellee's version of events. While the Appellant asserts that the spread sheet constituted impermissible hearsay, the Court is mindful that "administrative tribunals may make use of hearsay evidence only within a limited context and in circumstances when it is necessary to ascertain facts not reasonably susceptible of proof under the normal rules of evidence."Wood v. Ford, 525 A.2d 901, 904 (R.I. 1987).
In this case, because the Appellee no longer had access to the Appellant's place of business, she was not in a position to otherwise ascertain the facts contained in the spread sheet. Conversely, the Appellant did not attempt to rebut the spread sheet evidence by producing the bulletin board evidence. Instead, the Appellant produced trust documents that the hearing officer impliedly found unconvincing and not competent.[4] The hearing officer's reliance upon the competent evidence presented by the Appellee was not clearly erroneous, and the Court cannot substitute its judgment for that of the Department concerning the weight of the evidence. See Foster-Glocester RegionalSchool Committee, 854 at 1012 ("This Court does not substitute its judgment for that of the agency concerning . . . the weight of the evidence concerning questions of fact.")
The Appellant additionally asserts that the hearing officer mischaracterized the testimony of Mr. Truss when he found that Mr. Truss maintained that no commissions were due to the Appellee. The Appellant claims in its memorandum that Mr. Truss "clearly testified that itwas *Page 9 possible that Clauson was owed commission payment on at least 10 loans after June 3, 2005." Appellant's Memorandum at 13 (emphasis added).
However, the hearing officer's reliance upon the Appellee's evidence is supported by his findings with respect to the credibility of the witnesses. In his decision, the hearing officer reviewed the testimony of both witnesses concerning the events surrounding the Appellee's employment. In so doing, the hearing officer paid meticulous attention to the credibility of the two witnesses. See State v. Woods, No. 2005-263-C.A., slip op. at 5 (R.I. filed November 28, 2007) (holding that the deference accorded a hearing officer on issues of credibility is because the Court, which "do[es] not have the same vantage point as the [hearing officer], . . . [is] unable to assess the witness' demeanor, tone of voice, and body language"). The hearing officer found that the Appellee's "account of the facts was consistent, deliberate, sincere and candid, and [he found] her testimony credible."Decision at 2. He additionally found her testimony to be "credible on the issue of the commission compensation agreement, which was verbal."Id. at 3. He concluded that the Appellee "either completed or substantially completed her duties as a closing manager on the 26 loans on Petitioner's Exhibit 2." Id.
With respect to the testimony of Mr. Truss, the hearing officer first observed that "Mr. Truss was hired after both Ms. Lamire and Ms. Clausen had separated from employment with the respondent, and was not in a good position to have first hand knowledge of the commission agreement between Ms. Clausen and The Rhode Island Mortgage Store, Inc."Id. He then found that Mr. Truss's
 "answers to questions were disjointed and vague, and he maintained that no commissions were due to the petitioner, when it was fairly well conceded that she was owed for ten or eleven unpaid commissions earned on or after June 3, 2005. I find his testimony unworthy of belief and reject it." Id. *Page 10 
He additionally found that "[t]he respondent's sole witness [Mr. Truss] was unconvincing." Id.
The record reveals that while Mr. Truss did not deny absolutely that the Appellee was owed commissions, neither did he admit any such obligation. When asked about certain names in the Appellee's spread sheet, Mr. Truss agreed that it was "possible" that some commission payments were outstanding. See tr. at 78. However, he then qualified his answer by suggesting that because the spread sheet had been hand-typed, it could have been altered. Id. at 78-79. Specifically, he stated "But, just as — in Ms. Clausen's testimony, she says that these documents could be altered, I don't trust these documents either, when they are hand typed in and all off [sic] memory. I mean, if they are on here, yes; but the validity, I can't testify to that." Id. When later pressed, Mr. Truss again agreed that it was "possible" that the Appellee may be owed commission payments. Id. at 80. (Emphasis added). At no point, however, did he definitively concede that the Appellant owed commissions to the Appellee. In view of this testimony, the Court concludes that the hearing officer did not misconstrue the evidence when he found that Mr. Truss maintained that no commissions were due to the Appellee.
The Appellant next asserts that the Appellee's testimony concerning the restoration of her commission to $200 was inconsistent with her testimony before the Board of Review in an unrelated unemployment claim, because she testified before that Board about the reduction of her commission to $100, but did not mention the subsequent restoration. The hearing officer, however, found that "the purported inconsistency in testimony was either trivial, or dependent on upon multiple inferences."Decision at 2. The Court can find no error in this finding.
Considering that the hearing officer's decision rejected Mr. Truss's testimony as not credible, the Court will now review some of that testimony. At the hearing, Mr. Truss was asked *Page 11 
whether he was familiar with the Appellee. Tr. at 62. He responded: "Only her case; not her, as an individual." Id. The following colloquy then took place:
 "Q. Do you know in what capacity she was employed as?
 A. The record states that she was a process manager.
 Q. What does a process manager do?
 A. I believe they would be responsible for the oversight of all loans that were going through processing at that time and any other processors that were under their care." Id. (Emphasis added.)
Later, Mr. Truss testified that when the commission rate was reduced, it "was just $100 straight on every loan, and that's how I understood itto be, all the way through the process." Id. at 63 and 72-73 (emphasis added). He then stated that he was unaware of any agreement to restore the Appellee's commission back to $200 per loan, and that based upon his review of the record, it appeared that she only received $100 per loan from April forward. Id.
Mr. Truss also testified that he "believed" that the Appellee had received all of the commissions that she earned between March and April, 2005. Id. at 65. He further stated that he was unable to account for any loans that may have closed between June 3, and June 15, 2005, because "unfortunately, we don't have records. Again, she could have gotten paid on them, and we don't know that." Id. at 78. The hearing officer asked Mr. Truss whether he was alleging "that there was never any agreement to share commissions, $100 each, between Jessica Lemire and, then, Ms. Clauson?" Id. at 81. Mr. Truss replied: "Not to my knowledge."Id. (Emphasis added.) The hearing officer then asked "You never heard of that?" Id. To which Mr. Truss responded "No." Id.
Considering that the hearing officer was present to hear and see the witnesses testify, the Court will not substitute its judgment on the issue of credibility. See Foster-Glocester Regional SchoolCommittee, 854 at 1012 ("This Court does not substitute its judgment for that of the agency concerning the credibility of witnesses. . . .");see also Woods, No. 2005-263-C.A., slip op. at 5 *Page 12 
(observing that the Court's viewpoint "is limited to analyzing words printed on a black and white record[, and that] . . . `[t]he hearing officer was a front row observer for this testimony, giving [him] a far greater edge in making credibility determinations than [the Court] could ever hope to have in reviewing the black and white transcript.'") (Quoting National Labor Relations Board v. Erie Brush and ManufacturingCorp., 406 F.3d 795, 802 (7th Cir. 2005)).
Consequently, the Court concludes that the hearing officer did not err when he found the answers given by Mr. Truss were vague, disjointed, and unconvincing. Neither did he err when he found the Appellee's testimony to be credible.[5]
 B. The Assessment of a Fifty-Percent Penalty
The Appellee maintains that the decision was arbitrary, capricious, an abuse of discretion, and an error of law, because there was no evidence in the record to support the assessment of a fifty-percent penalty. The Court disagrees.
Where the language of a statute "is clear on its face, then the plain meaning of the statute must be given effect and this Court should not look elsewhere to discern the legislative intent." Retirement Bd. ofEmployees' Retirement System of State v. DiPrete, 845 A.2d 270, 297
(R.I. 2004) (internal quotations omitted). Accordingly, when "a statutory provision is unambiguous, there is no room for statutory construction and [this Court] must apply the statute as written."Id.
Section 28-14-19(b) provides:
 "The director is authorized to supervise the payment of amounts due to employees, and the employer may be required to make these payments to the director to be held in a special account in trust for the employees, and paid on order of the director directly to the employee or the employees affected. The employer shall also pay *Page 13 
the director an administrative fee equal to twenty-five percent (25%) of any payment made directly to the employee or employees or made to the director pursuant to this section and chapters 5-23, 25-3 and 28-12 for the first offense. An additional payment in the amount of fifty percent (50%) shall be assessed for each subsequent violation. The fee shall be deposited in the general fund." (Emphasis added.)
According to the clear and plain language of § 28-14-19(b), an employer must violate chapters 28-14, 5-23, 25-3, or 28-12, at least once before the employer must be assessed the mandatory fifty-percent penalty.
In the instant matter, the Appellee filed a complaint seeking reimbursement of unpaid wages and commissions. The claim for unpaid wages was settled and resolved in the amount of $2374.62 before the hearing took place. See Tr. at 5. The record reveals that the Appellant was assessed, and paid to the Department, a penalty amounting to fifty-percent of the unpaid wages award. See id. At the hearing, the following colloquy took place:
 "THE HEARING OFFICER: I understand, from speaking with [Department Examiner] Ms. Breton, that the claim for unpaid wages has been settled and resolved?
 [Counsel for the Appellant] MR. MURRAY: That's correct.
 THE HEARING OFFICER: That was a payment of $2374.62 paid to Ms. Clauson, on or about June of `06?
 MS. CLAUSON: That's correct.
 THE HEARING OFFICER: And, the Department received an administrative fee for a penalty on that of 50 percent?
 MR. MURRAY: That's correct.
 THE HEARING OFFICER: The parties agree and stipulate that the overtime wage claim is settled?
 MS. CLAUSON: Yes." Id. (Emphasis added.)[6] *Page 14 
In light of the fact that the Appellant paid a fifty-percent penalty on the unpaid wages claim, the hearing officer reasonably concluded that the Appellant had violated chapters 28-14, 5-23, 25-3, or 28-12 at least once prior to the instant action. Accordingly, the Court concludes that the imposition of the fifty-percent penalty in accordance with §28-14-19(b) was not clearly erroneous, in excess of the statutory authority of the agency, or an abuse of discretion.
 Conclusion
After a review of the entire record, the Court finds that the Department's granting of the Appellee's complaint was supported by the reliable, probative, and substantial evidence, was not arbitrary and capricious, was not in violation of statutory provisions, and was not an abuse of discretion. Substantial rights of the Appellant have not been prejudiced. Accordingly, this Court upholds the Department's decision.
Counsel shall submit an appropriate order consistent with this opinion.
[1] The Department of Labor and Training has not filed a memorandum in this action.
[2] The Appellee claims that Jessica Lemire only worked at Appellant's Warwick office for a few weeks. The Appellant did not provide the dates of Ms. Lemire's hire and resignation; indeed, the Appellant's witness, Brian Allen Truss, who was hired after the Appellee left her employment, was unable to provide any information about Ms. Lemire's employment history.
[3] Section 28-14-19(a) of the Rhode Island General Laws provides:
 "It shall be the duty of the director to insure compliance with the provisions of this chapter, to investigate any violations of this chapter, to institute or cause to be instituted actions for the collection of wages and to institute action for penalties provided under this chapter. The director or his or her authorized representatives are empowered to hold hearings and he or she shall cooperate with any employee in the enforcement of a claim against his or her employer in any case whenever, in his or her opinion, the claim is just and valid."
[4] The fact that the hearing officer found Mr. Truss's testimony unconvincing and unworthy of belief would support a conclusion that he also found the trust documents unworthy of belief.
[5] As noted in the decision, the president of the Rhode Island Mortgage Store, Mr. Alan Berkovitz, did not take the stand to clarify some of Mr. Truss's vague testimony, and the Appellee prevailed on her unpaid wages claim against the Appellant. It is conceivable that these facts helped to influence the hearing officer's credibility determinations.
[6] The Court observes that when counsel for the Appellant agreed that the Appellant had been assessed, and had paid, a fifty-percent penalty on the unpaid wages portion of the Appellee's Complaint, he did so without objection. See East Bay Community Development Corp. v. ZoningBd. of Review of Town of Barrington, 901 A.2d 1136, 1152-53 (R.I. 2006) ("Not only does the [raise-or-waive doctrine] serve judicial economy by encouraging resolution of issues at the trial level, it also promotes fairer and more efficient trial proceedings by providing opposing counsel with an opportunity to respond appropriately to claims raised.") Assuming, however, this issue was not waived, considering that the wages claim was but one part of Appellee's original Complaint, a reasonable inference can be made that failure to object to the fifty-percent penalty on the wages claim constituted a tacit admission by the Appellant that this was not its first violation of § 9-1-29. Consequently, additional evidence was not required on this issue.